IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SALEDA GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 0234 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Maria Valdez |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Saleda Griffin's claim for Disability Insurance Benefits and Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons contained herein, Griffins' Motion for Summary Judgment [Doc. No. 22] is granted in part. The Court finds that this matter should be remanded for further proceedings.

## I. PROCEDURAL HISTORY

Saleda Griffin ("Griffin") initially applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 22, 2004. (R. 5, 57.) Both applications allege disability beginning February 1, 2002. (R. 57.) The applications were denied on November 3, 2004 and upon reconsideration on April 6, 2005. (R. 30-

39.) Thereafter, Griffin filed a timely request for a hearing on May 11, 2005. (R. 40.) On December 8, 2006, Griffin appeared, with counsel, and testified at a hearing held in Chicago, IL. (R. 392.) Grace Gianforte, a vocational expert, and Danzetta Griffin, the claimant's mother, also appeared at the hearing. (*Id.*)

On March 27, 2007 the ALJ determined that Griffin was not disabled and therefore denied her applications for DIB and SSI. (R. 15-26.) Griffin filed a timely Request for Review of the unfavorable decision on April 4, 2007. (R. 10.) The Appeals Council denied the claim, leaving the decision of the ALJ as the final decision and therefore reviewable by the District Court under 42 U.S.C. § 405(g). (R. 7-9.)

## II. **FACTUAL BACKGROUND**

### A. **Background**

Griffin was born on November 8, 1964. (R. 57.) She has completed two years of college. (R. 402.) Griffin is divorced with two children, a son age 24 and a daughter age 3, and lives with the daughter at her mother's home. (R. 409-10.) She worked as a bus driver for the Chicago Transit Authority ("CTA"), a laborer and a machine operator before claiming disability as of February 1, 2002. (R. 80.) Griffin alleges disability due to bipolar disorder, hearing voices, an inability to leave the house, and panic attacks. (R. 79-80.)

## B. **Testimony and Medical Evidence**

### 1. **Griffin's Testimony**

At the hearing, Griffin testified that she worked as a CTA bus driver until she resigned in February 2002. (R. 402.) Afterwards, she worked through a temporary agency as a cook and a day laborer. (R. 407.) She then worked as a machine operator from March 2002 to January 2003 until she was fired for "getting into a fight" with the manager. (R. 408.)

Griffin claimed that she did not use drugs as a teenager or a young adult. (R. 413.) However, she reported that she has been addicted to heroin since she was treated with morphine when she was hospitalized following a stabbing in 2002 (R. 404.) She testified that she was stabbed three times, twice in the back and once in the stomach, and that she received treatment at Loyola Hospital for a period of one and one-half months. (R. 403.) She reported that she has been unable to function normally since the stabbing. (R. 404.)

Griffin testified that she receives methadone treatment for heroin addiction once a week from Dr. Jack Johns at Nexa, Inc. (R. 413-15.) Griffin stated that prior to the treatment from Nexa, Inc., she received methadone treatment from Paul Ritas. (R. 424.)

Griffin testified to having been diagnosed with bipolar disorder as a child and claimed that she received treatment from a counselor at her high school but did not receive medication. (R. 418-19.) Griffin stated that she had been diagnosed with schizophrenia at Madden Mental Health Center, Loretto Hospital, and Mount Sinai

Hospital. (R. 428.) Griffin alleged that she has received prescriptions for Zoloft and Zyprexa from Mount Sinai Hospital. (*Id.*)

Griffin asserted that whenever she tries to go out she has panic attacks where she sweats, has a severe headache, and cannot breathe. (R. 427.) When this happens she takes Zoloft to calm herself. (*Id.*) She stated that she had one of these attacks before attending the hearing. (*Id.*) She testified that she also has panic attacks when she thinks about having to go out. (R. 431.)

Griffin alleged that she has tried on more than one occasion to kill herself, with the last time being approximately three months before the hearing. (R. 426-27.) She claimed that she sometimes hears voices in her head cursing and telling her that she is worthless. (R. 430.) She stated that she is sometimes able to block them out, but other times they "get very bad" and that is what drove her to try and kill herself. (*Id.*) She claimed that she heard voices throughout the entire week prior to the hearing, but that it "comes and goes." (*Id.*)

Griffin reported that she spends almost all of her time in her room at her mother's house and that her mother does all the cooking. (R. 409.) She asserted that she rarely leaves her room or plays with her three-year-old daughter and that her friend or her mother's friend takes care of her daughter. (R. 412.)

Griffin stated that she has pain in her right hip and migraine headaches. (R. 424-25.) Griffin also testified that she was diagnosed with diabetes two years before the hearing. (R. 424-25.) She claimed that she does not maintain treatment for the diabetes because she does not want to leave the house. (R. 425.)

## 2. <u>Testimony of Plaintiff's Mother, Donzetta Griffin</u>

Plaintiff's mother, Donzetta Griffin ("Donzetta"), testified at the hearing on behalf of Griffin. She stated that Griffin has been living with her since 2001. (R. 432.) Donzetta indicated that she does all of the cooking, cleaning, and dishwashing, and generally does "just about everything in the house." (R. 433.) She also stated that she does almost all of the caring for Griffin's three-year-old daughter who lives in the house with them. (*Id.*) Donzetta testified that when she goes to work, Griffin is usually still asleep and that she has a friend that comes over to care for the child. (R. 434.) Donzetta alleged that Griffin has been on methadone "on and off" since 1999 and has been on the treatment continuously since 2000. (R. 436.) Donzetta testified that she has never seen Griffin use any illegal drug but that she first became aware of Griffin's drug problem in 1999. (R. 440.)

Donzetta stated that when she is home, Griffin never comes out of her room but spends all of her time sleeping or watching television. (R. 440-41.) She reported that when Griffin is in her room alone, she often hears her talking as though she had company. (R. 441.) Donzetta stated that Griffin has difficulty going with her to the methadone clinic and that she must be reminded to take baths. (R. 441-42.) Donzetta testified that she is familiar with Griffin's prescription for Zoloft, but that she was unfamiliar with her prescription for Zyprexa. (R. 442-43.) She asserted that Griffin has a relative or someone she knows pick up her prescriptions. (R. 443.)

### 3. **Medical Evidence**

In August 1999, Griffin was hospitalized at the Madden Mental Health Center where she tested positive for cocaine, opiates, cannabinoids, and barbiturates. (R. 184, 187.) Griffin's intake form from Madden reflects that she was depressed, heard voices, and was suicidal. (R. 196-97.) The discharge papers, however, indicate that Griffin lied about being suicidal in order to receive detoxification treatment. (R. 185, 187.) She was given a discharge diagnosis of malingering, heroine addiction, and a rule out of substance induced mood disorder. (R. 184, 188, 339).

Griffin received treatment at Mount Sinai Hospital in August 2003 for wounds inflicted by her husband's ex-girlfriend with a baseball bat. (R. 306.) In September 2003, Griffin returned to Mount Sinai Hospital and complained of abdominal pain, which was determined to be due to an amniotic membrane rupture. (R. 119.) On September 14, 2003, she received a psychiatric consultation "for medication recommendation/ bipolar management." (R. 106.) The psychiatric consultant observed that she was tearful, had poor hygiene and grooming, that she had occasionally circumstantial speech and labile affect (tearful one minute and laughing the next). (*Id.*) She was diagnosed with bipolar disorder and started on Zyprexa (an anti-psychotic medication).(*Id.*)

On September 29, 2003, Griffin was admitted to John H. Stroger Hospital of Cook County (hereinafter "Cook County Hospital") from Mount Sinai Hospital for further management. (R. 268.) On September 30, 2011, Griffin was given an initial

psychiatric consultation at Cook County Hospital, for refusing to take her medications, including Haldol (an anti-psychotic medication) and Paxil (an anti-depressant medication). (*Id.*) She reported being diagnosed with bipolar disorder since age 17. (*Id.* ) The psychiatric examiner, Dr. Rashid, noted that Griffin had mood swings and auditory hallucinations. (*Id.* ) He gave her a diagnosis of bipolar disorder (by history). He  suggested she discontinue Haldol and Paxil and instead prescribed Zyprexa and Prozac (an anti-depressant). (*Id.*) In a psychiatric follow up progress note, the psychiatric examiner was noted that Griffin had a labile affect, auditory hallucinations, and paranoia. (R. 266.) The psychiatric examiner diagnosed her with bipolar disorder (hypomanic) and suggested Griffin discontinue taking Prozac because she was hypomanic at present, but continue taking Zyprexa. (*Id.*) Griffin remained in the hospital until she gave birth to her daughter on October 8, 2003. (R. 207.) On October 9, 2003, Griffin was discharged with a diagnosis of bipolar disorder (hypomanic), and received the following discharge medications: Zoloft and Zyprexa. (R. 208.)

In June and July of 2004, Griffin was hospitalized at Mount Sinai Hospital and diagnosed with alcoholic steatohepatitis[1], type-2 diabetes, hepatosplenomegaly[2], and jaundice. (R. 279, 296.)

On September 20, 2004, Allan Nelson, M.D., S.C., conducted a psychiatric evaluation of Griffin for the Bureau of Disability Determination Services. (R. 313)

---

[1]Steatohepatitis is a liver disease, most often caused by alcohol abuse. *Stedman's Medical Dictionary* (28th ed. 2006).
[2]Hepatosplenomegaly is a conditions characterized by the enlargement of the liver and spleen. *Stedman's Medical Dictionary* (28th ed. 2006).

Dr. Nelson interviewed Griffin for forty-five minutes and reviewed the 1999 psychiatric report from Madden Mental Health Center indicating a diagnosis of malingering, drug abuse, and drug-induced mood disorder. (*Id.*) Dr. Nelson noted that Griffin was "quite depressed, anxious, withdrawn and preoccupied, cried continuously, and rocked back and forth throughout." (*Id.*) Griffin described suffering from panic attacks for the previous four years, whenever faced with the prospect of going out. (*Id.*) She reported that during these attacks she experienced severe anxiety, fears of dying, palpitations, shortness of breath, excessive sweating, and dizzy spells. (*Id.*) She reported that they occur about three times a day. (*Id.*) She stated that she is chronically depressed, with feelings of low self-esteem, helplessness, hopelessness, futility, poor appetite, insomnia, and forgetfulness. (*Id.*) She reported suicidal ideations and multiple suicide attempts. (*Id.*) Griffin reported hearing voices telling her to kill herself and other derogatory things, and indicated that she has paranoid fears that people are following her, watching her, and are out to harm her. (R. 313-14.) Dr. Nelson indicated that Griffin was currently taking the following medication: Zoloft and Zyprexa. (R. 314.)

Dr. Nelson reported that when he showed her the 1999 psychiatric evaluation indicating a use of multiple drugs, Griffin adamantly denied this and stated that she used heroin only once or twice to reduce some pain that she was experiencing in the past. Dr. Nelson stated, "Her explanation seemed questionable at best." (R. 314.)

8

Dr. Nelson found that Griffin's ability to communicate was significantly impaired as a result of her mental state. (R. 314.) He observed significant retardation of Griffin's speech, extreme depression, anxiety, withdrawal, preoccupation, difficulty concentrating, and continuous crying. (R. 315.) Dr. Nelson commented that Griffin was unable to remember the day of the week, month or date and that she thought it was the year 2003. (*Id.*) He also noted that Griffin had deficits in abstractive reasoning and had significant impairments in her judgment. (*Id.*) Dr. Nelson diagnosed Griffin with depressive disorder, panic disorder with agoraphobia, and histrionic personality disorder. (*Id.*) Dr. Nelson concluded that Griffin's prognosis is guarded and that if granted disability, she would be unable to manage her own funds. (R. 316.)

On October 13, 2004, Gallasi-Hudspeth Psy.D., a non-examining State Agency psychologist, reviewed the record and noted that Griffin had moderate limitations in her ability to understand, remember, and carry out detailed instructions; moderate limitations in her ability to interact appropriately with the general public and to respond appropriately to changes in the work setting; and moderate limitations with her ability to set realistic goals or make plans independently of others. (R. 317-18.) Dr. Gallasi-Hudspeth indicated that Griffin had "a credibility issue" based on inconsistencies between the record and her self-reports. (R. 320.)

Dr. Gallasi-Hudspeth stated that Griffin "is able to perform simple and routine work tasks at least" but "shouldn't deal with the public but can relate to a

supervisor." (*Id.*) Dr. Gallasi-Hudspeth diagnosed Griffin with a depressive disorder, a personality disorder and a history of substance abuse disorder. (R. 324, 328-29.) He noted that Griffin had the following functional limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. 331.)

After the hearing in December 2006, the ALJ requested that Ana Gil, M.D., S.C. examine Griffin. (R. 374-78.) Dr. Gil reviewed the 1999 discharge notes from Madden Psychiatric Hospital, the Mount Sinai Hospital medical progress notes dated 2004, and the psychiatric evaluation of Dr. Nelson dated September 20, 2004. (R. 374.) Dr. Gil examined Griffin for forty-three minutes. (R. 374-78.) Dr. Gil opined that Griffin "appeared to be a reliable informant." (R. 374.) She noted that Griffin had mild psychomotor agitation and was tearful throughout the interview. (*Id.*) Griffin told Dr. Gil that she heard voices telling her that she is bad and should kill herself, and that she has panic attacks weekly when she has to leave the house. (R. 375.) Dr. Gil indicated that Griffin has symptoms consistent with chronic posttraumatic stress disorder, including intrusive thoughts and flashbacks to the traumatizing event. (R. 377.) Dr. Gil stated that Griffin has experienced mood congruent auditory hallucinations. (R. 378.) Dr. Gil diagnosed Griffin with "major depression recurrent with psychotic features-moderate in severity," "panic attacks with agoraphobia-severe," "chronic posttraumatic stress disorder-severe," and "past history of chronic opiate dependence and abuse in remission for the past two years

10

and the claimant is currently on methadone maintenance at the Nexa clinic." (*Id.*)
Dr. Gil noted that if Griffin were awarded benefits she would not be able to handle
them herself. (*Id.*)

Dr. Gil concluded that Griffin was at least moderately limited in every
functional area. (R. 379-80.) On the issue of Griffin's drug abuse, Dr. Gil indicated
that Griffin's opiate abuse is being treated for the past 2 years with Methadone and
"is immaterial to her current symptoms."(R. 381.) Dr. Gil also stated that Griffin is
so fearful of leaving her house that she had not seen a psychiatrist in two years and
refills her prescriptions of Zoloft and Zyprexa from Mount Sinai Hospital over the
telephone. (R. 375, 381.)

### 4. **Vocational Expert's Testimony**

Grace Gianforte testified as the vocational expert ("VE") at the hearing. (R.
444.) The VE testified that Griffin worked as a teacher's aide, which is light in
exertion; a bus operator, which is medium in exertion; a cook, which is the low end
of semiskilled; and a machine operator, which is light and unskilled. (R. 444-45.)

The ALJ asked the VE to identify jobs which could be performed by a
hypothetical person of Griffin's age, educational background and work experience.
(R. 446.) The hypothetical person could do the following activities: lift 25 pounds
frequently and 50 pounds occasionally; sit, stand, and walk up to six hours each in
an eight-hour day; push and pull 25 pounds frequently, 50 pounds occasionally;
perform simple routine tasks; have occasional interaction with the public; have
occasional changes in work routine and setting; and make occasional work-related

11

judgment and decision-making. (*Id.*) The hypothetical person must avoid concentrated exposure to hazardous machinery and unprotected heights. (*Id.*)

The VE responded that of Griffin's past work, the only job she could still perform was likely the machine operator position, as the bus driver and cook positions both involved too frequent interaction with the public. (R. 446-47.) However, the VE testified that the hypothetical individual could perform the following jobs in the national economy: hand packer, food preparation worker, dining room and cafeteria worker. (R. 447-48.) These positions, combined, number approximately 104,000 positions in this region of the economy. (*Id.*)

The ALJ then adjusted the hypothetical so that the individual had the same limitations but could only carry ten pounds frequently and twenty pounds occasionally, and could push and pull ten to twenty pounds. (R. 448-49.) The VE responded that such a hypothetical individual could perform the positions of light cleaners, mail clerks, and order callers which make up a combined 16,500 jobs. (R. 449.)

The ALJ adjusted the hypothetical a third time so that the individual could lift and carry ten pounds, sit for six hours and walk or stand for two hours. (R. 449.) The VE indicated that this hypothetical individual could perform jobs in the electrical and electronics industry as well as the jobs of electrical accessory assemblers, dial markers, and sedentary packers, which combine to number approximately 12,500 positions. (R. 449-50.) The VE testified that the number does

not include jobs in the electrical and electronics industry because she only had those numbers collectively. (*Id.*)

The ALJ's fourth hypothetical added the following limitation: "substantial loss of ability to maintain attention and concentration for extended periods and substantial loss of ability to complete a normal workday or work week without interruption for psychologically based symptoms." (R. 450.) The VE opined that such a limitation suggests an inability to maintain a level of productivity that is associated with competitive work in any of the prior hypothetical situations. (*Id.*) The VE testified that if the hypothetical person were off task for five consecutive minutes of every hour, the individual would be unable to sustain competitive employment. (R. 451-52.)

## C. **ALJ Decision**

The ALJ found that Griffin's substance abuse disorder is a contributing factor material to the determination of disability and that Griffin would not be disabled if she stopped her substance abuse. (R. 26.) As a result, the ALJ determined that Griffin was not disabled within the meaning of the Social Security Act at any time between the alleged onset date and the date of the decision and upheld the Commissioner's denial of SSI and DIB. (*Id.*)

The ALJ found that Griffin had many severe impairments including: a history of alcoholic steatohepatitis, hepatosplenomegaly and jaundice, a history of polysubstance abuse that is possibly in remission, possible methadone drug rehabilitation, alcohol dependency, depressive disorder, panic disorder with

agoraphobia, and post traumatic stress disorder. (R. 18.) The ALJ indicated that these impairments, including the substance abuse disorder, meet Listings 12.04 and 12.09, but that the effects of the mental impairments are exacerbated by Griffin's substance abuse. (R. 20.) The ALJ stated that when the effects of the substance abuse are removed from consideration, "the claimant only has moderate difficulties in her ability to maintain concentration, persistence, or pace." (*Id.*) The ALJ found that her impairments would continue to be severe but would no longer meet a Listing, stating, "[h]er polysubstance abuse significantly limits her ability to engage in substantial gainful activity through its exacerbating effects on her memory, mood, attention, and concentration abilities, and thoughts of suicide." (*Id.*)

The ALJ opined that if Griffin ceased her substance abuse, her residual functional capacity ("RFC") allows her the ability to lift, carry, and push and pull up to twenty pounds occasionally and ten pounds frequently, to stand, walk and sit for about six hours in a day, and perform simple routine tasks, have occasional interaction with the general public, occasional changes in work routine and setting, and make occasional work-related judgments and decision-making. (R. 21.)

The ALJ determined that Griffin would be unable to perform her past relevant work as a teacher's aide, cook, machine operator, or bus driver, even if she ceased her substance abuse. (R. 24.) The ALJ indicated that despite the inability to perform past relevant work, there would be a significant number of jobs in the national economy that Griffin could perform if she stopped her substance abuse. (R. 25.)

The ALJ concluded that if the claimant stopped abusing substances, "she would be capable of making a successful adjustment to work that exists in significant numbers in the national economy," and therefore a finding of "not disabled" is appropriate. (R. 25.)

## III. DISCUSSION

### A. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently disabled? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2010).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386,389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden shifts to the

Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## B. JUDICIAL REVIEW

Section 405(g) provides that "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the decision of the ALJ is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 289, 401 (1971; *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence or deciding questions of credibility. *Skinner*, 478 F. 3d 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. That is, the ALJ is required to give enough detail and clarity to permit meaningful appellate review. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence could create differing inferences between reasonable minds, a determination of disability lies with the Commissioner, not with this court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 2005). The ALJ is required to consider all relevant evidence, not only that which favors his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## C. <u>ANALYSIS</u>

Griffin requests reversal or, in the alternative, remand of the ALJ's decision, arguing that the ALJ erred when: (1) the ALJ impermissibly "played doctor," making an independent medical determination that Griffin's drug use is material to her disability; and (2) the ALJ improperly discounted the medical opinion of Dr. Gil, the only medical opinion that directly addressed the issue of materiality.[3] Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [hereinafter Pl.'s Mem.] at 1 [Doc. No. 23]. Each argument will be addressed below.

### 1. <u>ALJ Improperly "Played Doctor"</u>

Griffin asserts that the ALJ impermissibly "played doctor," making an improper independent medical determination that her drug use is material to her

---

[3] Griffin argues that the ALJ found her credible with regard to critical facts that require a finding of disability. Pl.'s Mem. at 8 [Doc. No. 23]. The Commissioner responds that Griffin mischaracterizes the ALJ's ruling, erroneously asserting that the ALJ suggested Griffin's other impairments would keep her in her room all the time. Def.'s Mem. at 13 [Doc. No. 24]. Indeed, although the ALJ found that even if Griffin ceased her drug use, her "medically determinable impairments could reasonably be expected to produce the alleged symptoms," the ALJ elaborated, "but . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 23.) This Court rejects Griffin's argument that an award of benefits is warranted solely based on the select areas where the ALJ found Griffin credible, without consideration of the areas where the ALJ questioned Griffin's credibility.

disability. Pl.'s Mem. at 9. [Doc. No. 23]. Griffin alleges that the ALJ relied on no medical opinion to reach the conclusion that Griffin's substance abuse exacerbated her concentration, persistence and pace problems but not her daily activities or social functioning. *Id.* at 9-10.

The Commissioner contends that there was substantial evidence to support the ALJ's determination that Griffin's disability was materially affected by her drug and alcohol use. Defendant's Memorandum in Support of His Motion for Summary Judgment [hereinafter Def.'s Mem.] at 10 [Doc. No. 24].

In drug and alcohol abuse cases, "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). According to Social Security Ruling 82-60, the key issue in evaluating a claimant who has a drug addiction and is found to be disabled is whether they "would continue to meet the definition of disability even if drug and/or alcohol use were to stop." SSR 82-60 (1980). If the claimant fails to meet this test, then a finding of disability is inappropriate. *Id.* However, drug addiction and alcoholism requirements are imposed only if "(1) the individuals impairment is found disabling and drug addiction and/or alcoholism is a contributing factor material to the determination of disability, and (2) the same impairments would no longer be found disabling if the individual's drug addiction or alcoholism were eliminated, as, for example, through rehabilitation treatment." *Id.*

An ALJ is given broad discretion to weigh the evidence; however, she "must not succumb to the temptation to play doctor and make [her] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). When it comes to making a medical determination, "[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The Seventh Circuit has emphasized that when it comes to mental illnesses, "health professionals, in particular psychiatrists . . . are the experts," *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995), as these conditions are "less amenable to concrete diagnostic techniques." *Kuwahara v. Bowen*, 677 F. Supp. 552, 560 (N.D. Ill 1988). An ALJ "plays doctor" in drug and alcohol cases when she rejects medical diagnoses of other mental impairments "without giving adequate reasons for doing so." *Kangail v. Barnhart*, 454 F.3d 627, 629 (7 th Cir. 2006). An ALJ is bound to articulate his analysis of the evidence sufficient to allow an appellate court to trace the path of his reasoning and may not select and discuss only that evidence that supports his conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7 th Cir. 1994); *Carlson v. Shalala* 999 F.2d 190 181 (7th Cir. 1993); *Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386 (7th Cir. 1992).

The ALJ found that Griffin's impairments met the requirements of Medical Listings 12.04 and 12.09. (R. at 20.) However, the ALJ asserted that these mental and physical impairments are exacerbated by her polysubstance abuse and that if she stopped the substance use, her remaining limitations would no longer meet the qualifications of these Medical Listings. (*Id.*) Specifically, the ALJ states that "the

totality of the medical records reveals that when the polysubstance abuse is removed, the claimant only has marked restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace." (R. 21.)

The ALJ does not reference any specific medical opinion when making the above assertion, but rather, generally states, "Both treating and examining physicians have noted the claimant's mental functioning significantly improves when she is not abusing alcohol or drugs." (R. 21.) However, it is unclear which treating and examining physicians have indicated that Griffin's functioning significantly improves when she is not abusing substances. Dr. Gil's examination, for instance, found that Griffin had marked limitations in her ability to complete a normal workday without interruptions from psychologically based symptoms such as panic attacks and agoraphobia, and that Griffin's opiate abuse is "immaterial to her current symptoms." (R. 381.) Additionally, the Cook County Hospital initial psychiatric consultation notes and psychiatric follow up notes in September and October 2003, when Griffin was hospitalized and not using substances, indicate that Griffin was diagnosed with bipolar disorder (hypomanic), had a labile affect, experienced auditory hallucinations and paranoia, and was prescribed Zoloft and Zyprexa by her treating psychiatrist. (R. 208, 266, 268.) Similarly, Dr. Nelson's psychiatric evaluation does not indicate any substantial improvement when Griffin is not abusing substances. Dr. Nelson diagnosed Griffin with Depressive Disorder, Not Otherwise Specified, Panic Disorder with Agorophobia, and Histrionic

20

Personality Disorder and indicated that at the time of the examination Griffin was extremely depressed, anxious, withdrawn, with occasional auditory hallucinations and frequent paranoid fears. (R. 315.) Dr. Nelson noted that Griffin's overall prognoses psychiatrically was guarded and if granted disability, she would be unable to manage her own funds. (R. 315-16.)

The ALJ also states, "I find that the limitations of the claimant to be a light residual functional capacity as described above is warranted by her depression, panic disorder with agoraphobia, post traumatic stress disorder and diabetes mellitus." The only citation to specific medical evidence that informed the ALJ's assessment of Griffin's residual functioning capacity when not using substances is the following:

> In reaching the above residual functional capacity, I have considered all evidence relating to how the claimant would function if the substance use was stopped. In 2003 she [Griffin] was hospitalized at Cook County Hospital in the third trimester of pregnancy and went home after delivering her baby (Exhibit 4F). She reportedly had been beaten by her husband. During this period of sobriety, she was started on Paxil and Haldol. Her recent memory was intact, her remote memory was fair, and she had good concentration, insight and judgment (Exhibit 4F 62-63)." (R.24.)

It is unclear how the fact that Griffin was started on Paxil (an anti-depressant) and Haldol (an anti-psychotic) during a period of sobriety factor into the ALJ's determination that Griffin has a light residual functional capacity when not abusing substances. Further, the ALJ only addresses portions of the 2003 Cook County Hospital records in her analysis. The initial psychiatric consultation at Cook County Hospital in 2003 indicated that Griffin had mood swings and auditory

hallucinations and was discontinued from Paxil and Haldol and instead prescribed Prozac (an anti-depressant) and Zyprexa (an anti-psychotic). (R. 262.) The 2003 follow up Cook County Hospital psychiatric records also indicate that Griffin had a labile affect, was sad, tearful, paranoid, responding to internal stimuli, feeling helpless, and had a tangential thought process. (R. 269-270.) The ALJ does not mention these portions of the record which are potentially contrary to her finding nor does the ALJ reconcile these symptoms with her finding that Griffin has a light residual functioning capacity when not abusing substances.

Regarding the materiality of Griffin's drug and alcohol use, the ALJ does not adequately articulate upon which medical evidence she relied, nor does she explain her ruling in light of contradictory evidence, including Dr. Nelson's psychiatric evaluation and the totality of the Cook County Hospital psychiatric records. Accordingly, the Court finds the matter must be remanded. *See Kangail*, 454 F.3d at 629; *Rohan*, 98 F.3d at 970; *Herron*, 19 F.3d at 333, 334 n.10.

## 2. The ALJ Improperly Discounts the Testimony of Dr. Gil

Griffin next argues that the ALJ improperly discounted the only medical opinion that directly addresses whether Griffin's drug use is material to her disability, the examination by Dr. Gil. Pl.'s Mem. at 10. [Doc. No. 23] Specifically, Dr. Gil's examination noted that Griffin had marked limitations in her ability to complete a normal workday without interruptions from psychologically based symptoms such as panic attacks and agoraphobia, and that Griffin's opiate abuse is "immaterial to her current symptoms." *Id.*

22

The Commissioner responds that the ALJ properly discounted Dr. Gil's examination because it relied entirely on Griffin's subjective complaints and representations, and that the ALJ instead relied on the report of a non-examining state agency psychologist. Def.'s Response at 12 -14 [Doc. No. 24.]. The Commissioner cites *Butera v. Apfel*, where the Seventh Circuit noted that a medical opinion is not entitled to significant weight where the physician "did not obtain any evidence beyond . . . [patient's] subjective complaints . . . ". *Id.* at 13 (*citing Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999)).

A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms. 20 CFR § 404.1508. Sources who can provide such evidence include licensed physicians, licensed or certified psychologists, and public and social welfare agency personnel. 20 CFR § 404.1513. Generally, more weight is given to the opinion of a source that has examined the claimant than to the opinion of a source who has not examined the claimant. 20 CFR § 416.927(d)(1); 20 CFR § 404.1527(d)(1). "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also* 20 CFR § 406.927(d).

Contrary to the ALJ and the Commissioner's assertions, Dr. Gil's assessment is not solely based on Griffin's subjective complaints. Rather, Dr. Gil made independent observations, reviewed the medical records from Madden Psychiatric

Hospital in 1999, the medical records from Mount Sinai Hospital in 2004, as well as the psychiatric evaluation of Dr. Nelson dated September 20, 2004. (R. 374.) Therefore, this Court finds insufficient the ALJ's explanation for rejecting Dr. Gil's report.

Additionally, this Court finds that the ALJ does not adequately explain her rejection of the report of another examining physician, Dr. Nelson. The ALJ states, "other than Dr. Gil . . . no other treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment." (R. 21.) However, this statement ignores the report of Dr. Nelson who examined Griffin in September, 2004. *See* (R. 13-16.) Dr. Nelson's report indicated findings similar in severity to Dr. Gil's report, and the ALJ makes no mention of this report or why she rejected it in favor of a non-examining psychologist's evaluation.

Accordingly, this Court finds that because the ALJ does not adequately explain her rationale for rejecting the opinions of treating and examining physicians and weighing more favorably a non-treating, non-examining psychologist's report, remand is necessary. *See Gudgel*, 345 F.3d at 470; *Herron*, 19 F. 3d at 333.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part Griffin's Motion for
Summary Judgment [Doc. No. 22] and remands this case for further proceedings
consistent with this opinion.

SO ORDERED.                          ENTERED:

DATE:    June 28, 2011
                                     HON. MARIA VALDEZ
                                     United States Magistrate Judge